NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251203-U

NO. 4-25-1203

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 23, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| MARVIN M. SANDERS, | ) | No. 20CF429 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Stephen A. Kouri, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Zenoff and Knecht concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court did not err in its admonitions to defendant under Illinois Supreme
Court Rule 401(a) (eff. July 1, 1984) before allowing him to proceed *pro se*.

¶ 2     Defendant, Marvin M. Sanders, appeals from his convictions of mob action (720
ILCS 5/25-1(a)(1) (West 2020)) and burglary (*id.* § 19-1(a)). On appeal, defendant contends he
was denied his constitutional right to counsel because the trial court failed to comply with Illinois
Supreme Court Rule 401(a) (eff. July 1, 1984) before allowing him to proceed *pro se* at trial.

¶ 3     We find the trial court substantially complied with Rule 401(a) and defendant was
not prejudiced by any infirmities in the court's admonitions. Accordingly, we affirm.

¶ 4                              I. BACKGROUND

¶ 5     In August 2020, the State charged defendant with mob action (*id.* § 25-1(a)(1)) and
burglary (*id.* § 19-1(a)) in connection with rioting and looting that occurred at a Dollar General

Store in Peoria, Illinois. At defendant's arraignment, defendant told the trial court he would be representing himself. The court advised defendant he had the right to an attorney, and the following colloquy occurred:

"THE COURT: [T]he charges that you face, I'm going to read those right now. It's alleged that on or about June 1, 2020, in Peoria County, Illinois, [defendant] committed the offense of burglary, a Class 2 felony, in that he did without authority knowingly enter within a building being Dollar General located at 4003 Southwest Adams, Peoria, Illinois, with the intent to commit a theft therein.

Now, [defendant], do you understand that charge?

[DEFENDANT]: Yes, sir.

THE COURT: Now, it being a Class 2 felony, it's punishable by three to seven years. If you are found to be extendable, that would be 3 to 14 years. You understand that?

[DEFENDANT]: Yes, sir.

THE COURT: That would be followed by two years mandatory supervised release, a possible $25,000 fine. It's, also, probationable by up to four years probation. You agree with that, State?

[STATE'S ATTORNEY]: Yes, [Y]our Honor.

THE COURT: [Defendant], do you understand that?

[DEFENDANT]: Yes, sir.

THE COURT: Okay. Count 2 it's alleged that on or about June 1, 2020, in Peoria County, Illinois, [defendant] committed the offense of mob action, a Class 4 felony, in that he, without authority of law and while acting together with at least

one other person, knowingly by the knowing or reckless use of violence or force disturbed the public peace at 4003 Southwest Adams, Peoria, Illinois. [Defendant], do you understand that charge?

[DEFENDANT]: I understand it, but I don't agree with it. But, yeah.

THE COURT: No one is asking if you agree with it.

[DEFENDANT]: I definitely understand everything you're saying.

THE COURT: I have to say that. I'm not accusing you of being a dummy or anything. I'm required to say these things and get your answers.

Okay. You say you understand it.

This is a Class 4 felony which means it's punishable by one to three years in the Department of Corrections. If you're found to be extendable, that would be one to six years in the Department of Corrections. Day-for-day good time applies. To be followed by one year of mandatory supervised release. A possible $25,000 fine. It, too, is probationable by up to 30 months probation. You understand all that?

[DEFENDANT]: Yes, sir."

Defendant told the court he had completed some college, could read and write English, had represented himself before, and had experience with criminal courts. Defendant understood that, if he represented himself, the court and the prosecutor would not assist him. Defendant also stated he understood a list of items an attorney would help him with and that not having an attorney could result in the State having an advantage in the case. Defendant also understood he would not be able to allege ineffective assistance of counsel on appeal if he were convicted.

¶ 6 Defendant asked for a copy of the trial court's admonitions. The court accepted defendant's waiver of counsel and told him a copy of the admonitions would be provided to him.

Defendant then proceeded *pro se* at various hearings.

¶ 7 In April 2021, the State told the trial court defendant was represented by counsel in a separate murder case. Defendant asked to be appointed counsel in the instant case. The court then appointed the public defender to represent him.

¶ 8 In May 2021, defendant appeared with counsel for both the murder case and the current case. Defendant told the trial court he wanted to move for a speedy trial. After counsel in the murder case told the court she would need more time to prepare for trial, defendant said he wanted to represent himself in both cases. The court told defendant it had a four-page script of admonitions it would need to read to him and continued the matter to June 10, 2021, to address the issue.

¶ 9 At the June 2021 hearing, defendant told the trial court he still wanted to represent himself in the murder case but wanted to keep the public defender in the instant case. The court read admonitions to defendant, and defendant stated he understood them. Twice in October 2021 and once in January 2022, the court again admonished defendant about the various disadvantages of appearing *pro se* in the murder case.

¶ 10 In May 2022, a jury found defendant not guilty of murder where he raised self-defense. Defendant was released from custody, and the trial court set the instant case for a scheduling conference and a trial in October 2022. Defendant failed to appear, and a warrant was issued for his arrest. On August 29, 2024, defendant appeared after having been arrested, and the public defender was reappointed.

¶ 11 In May 2025, defendant appeared before a different judge and informed the trial court of his desire to proceed *pro se*. The State advised the court the matter had been continued on multiple occasions. The court then told defendant if he chose to represent himself, it would not

continue the trial or later appoint him another attorney. Defendant replied, "I know how to do court. I know about this stuff and for the good or bad." The court told defendant it would hate to see him make a mistake, and the following colloquy occurred:

"THE COURT: You're charged with a Class 2 felony. That's punishable by 3 to 7 years in the Illinois Department of Corrections. It could be up to 14 if you're extended term eligible. It would be followed by one year mandatory supervised release. It could be up to a $25,000 fine. It could be 48 months probation or conditional discharge.

Do you understand that?

[DEFENDANT]: Yes, sir.

THE COURT: And you are not an attorney, I assume, correct?

[DEFENDANT]: No, sir.

THE COURT: You have a constitutional right to a lawyer as you know because you've been appointed one. You also have a constitutional right to represent yourself. You're telling me that you wish to give up your right to have an attorney and represent yourself in this case.

[DEFENDANT]: Yes, sir."

After further admonitions, the court asked, "Now, you know what you're charged with. You know the penalties. Do you acknowledge that those are the penalties?" Defendant said, "Yeah. I know it," and stated that he understood. The court further questioned defendant and ascertained that he had previously represented himself. Defendant told the court he represented himself at the murder trial that initially resulted in a mistrial due to a hung jury and then he was found not guilty after a second trial. The court allowed defendant to proceed *pro se*.

¶ 12    The first jury trial commenced in June 2025. Before juror selection, the following colloquy occurred.

"THE COURT: So we're going to trial on both counts; is that correct?

[STATE'S ATTORNEY]: That is correct.

THE COURT: And the first count is burglary. That's a Class 2 felony. Any special sentencing provisions?

[STATE'S ATTORNEY]: No.

THE COURT: All right. So Class 2 felony, [defendant] is punishable by 3 to 7 years in the Illinois Department of Corrections, could be up to 14 if you're extended term eligible, and would be followed by one year mandatory supervised release. It could be a term of probation up to 48 months. It could also be up to a $25,000 fine.

Count 2 is mob action. That's a Class 4 felony. That's punishable by 1 to 3 years in the Illinois Department of Corrections. It could be up to 6 if you're extended term eligible. It would be followed by 6 months mandatory supervised release. It could be up to a $25,000 fine. It could be up to 30 months probation or conditional discharge."

The court then questioned defendant about his experiences representing himself in court. Defendant stated he had previously participated in jury selection and indicated he was able to comprehend jury instruction issues.

¶ 13    The trial court asked defendant if there had been any plea offers, and defendant stated he was "not willing to discuss nothing." The following colloquy then occurred:

"THE COURT: Okay. There's no enhanced sentence that the State is

- 6 -

seeking, correct?

[STATE'S ATTORNEY]: Other than the potential for the extended term, no.

THE COURT: Is he extended eligible on both counts?

[STATE'S ATTORNEY]: I believe he is, yes.

THE COURT: And you understand what that means, right?

[DEFENDANT]: I believe for the counts it means I had a prior count in history, but so there's a count 2 and a count 3 that I'm charged with now. So, I've been convicted of a count 2 and 3 before?

THE COURT: Well, this is a Class 2 and a Class 4 felony. If you're found guilty and we go to sentencing, the State would have to present your record to show if you're extended term eligible. The State at this point believes you're possibly extended term eligible which means you could, when I talked about the Class 2, could be up to 14 years in the Illinois Department of Corrections if you're extended term eligible.

[DEFENDANT]: So what are the counts again?

THE COURT: You have a Class 2 felony. That's punishable by 3 to 7 years in the Illinois Department of Corrections. It could be up to 14 if you're extended term eligible.

[DEFENDANT]: And Class 4?

THE COURT: That would be followed by one year mandatory supervised release. The Class 4 is 1 to 3. It could be up to 6 if you're extended term eligible.

[DEFENDANT]: Class 2 and Class 4. Okay. Thank you.

THE COURT: Okay. All right."

¶ 14 Defendant proceeded to represent himself at trial. Evidence was provided that defendant took part in a burglary at the Dollar General store with multiple other people. Surveillance videos showed defendant present at the store and showed him removing items from the store and returning multiple times. Defendant testified in his defense and stated he was forced to take part in the burglary but did not inform the police because he feared for his life.

¶ 15 During trial, defendant questioned witnesses, gave a closing argument, and agreed to jury instructions regarding the charges of burglary and mob action. The trial resulted in a mistral due to a hung jury.

¶ 16 A second trial was scheduled before a new judge. Before trial, defendant filed three motions to dismiss, which were denied. Defendant filed 15 other motions. During the presentation of the motions, defendant told the trial court he had successfully beat a murder charge. Before evidence was presented, the court instructed the jury about the two charges.

¶ 17 Evidence was presented similar to that of the first trial. In opening statements, the parties told the jury the incident occurred during a night when there was a lot of protesting and looting happening in the area.

¶ 18 Donnella Coensgen, an employee of the Dollar General store at the time of the crimes, testified the store had been ransacked. Coensgen watched surveillance videos of the incident and observed approximately 30 people enter the store, including defendant and another person with a handgun. The store manager provided similar testimony. Two police officers viewed the video and identified defendant. However, in an interview, defendant denied being at the store.

¶ 19 The videos showed people breaking the glass in the entry doors and numerous people entering the store. Defendant was seen leaving the store with items and reentering the store

on numerous occasions. In many of the videos, a man wearing green was near or with defendant and was also seen repeatedly leaving the store with items and then reentering the store.

¶ 20　　　　In one video, defendant was seen pushing a cart of fans out the front door and returning to the inside of the store. In another video, depicting the stockroom, defendant entered alone, looked around, and then opened a back door and began pushing carts of items out the door. After defendant pushed multiple carts of items out the door, the person wearing green entered the room and also began removing items. Defendant repeatedly went outside with carts of items and at one point remained outside for over two minutes while the person wearing green and other people reentered the stockroom.

¶ 21　　　　In another video depicting the area around a cash register and capturing over eight minutes in length, defendant first spent approximately two minutes filling a bag with selected items, which he then set aside. Defendant then filled a shopping basket with items and set it aside. Defendant next left and returned with another bag, which he also filled with items and set aside. Defendant appeared to be selective in what he took, at one point climbing on a counter by the camera to select items from a top shelf and to look behind the shelf. Later in the video, defendant placed the bags he had set aside into larger baskets and, when another person removed some items from a basket, defendant put them back inside. Defendant and the person wearing green left with the baskets. Defendant then returned yet again, selected more items, and left. A video from the stockroom taken a few minutes later showed defendant leaving the store with a basket and a bag.

¶ 22　　　　One of the investigating officers testified he saw a person with a handgun in the videos. However, when describing the videos, the officer testified it looked like defendant was acting on his own and everyone in the store was acting for themselves.

¶ 23　　　　Defendant played the videos for the jury and narrated what occurred. Defendant

explained that before he entered the store, he had gone to pick up his cousin and three young men, who defendant described as "teenagers" or "kids," attempted to rob him at gunpoint outside his cousin's apartment. After the three young men realized he did not have anything valuable, they forced him to rob the Dollar General store, which was nearby. Defendant testified the leader, who had the handgun, gave commands and directed people as to what to take. Defendant said the person wearing green was one of the three men who forced him to rob the store. The person wearing green was the leader's accomplice and was always watching defendant. The other two men wore black, and one had a gun. Defendant testified he was never alone and there was always someone outside the stockroom door keeping watch. Defendant said he tried to leave twice but was caught both times. Although defendant earlier had indicated only the leader had a gun, he later stated all three men had guns. Defendant said he followed the directions given to protect himself.

¶ 24　　　　Defendant testified everyone ran when the police arrived. Defendant maintained he did not tell the police he was forced to rob the store because he feared for his life. Defendant testified he returned to his cousin's residence afterward, told her what happened, and told her to not tell anyone because "they said they gonna smoke us if we tell the police." Defendant admitted the three young men took nothing from him.

¶ 25　　　　Defendant's cousin, Corionna Mitchell-Pastoriza, testified defendant had come to pick her up because she had been drinking. She stated she saw three men point guns at defendant, but she could not hear what was said. Defendant told her everything was okay. According to Mitchell-Pastoriza, all three men had guns and were dressed in black. She admitted she was "buzzed" at the time.

¶ 26　　　　Defendant agreed to jury instructions regarding the two charges. The jury found defendant guilty. Defendant did not file any posttrial motions. The trial court sentenced him to

nine years' imprisonment on the burglary charge. The court merged the mob action conviction into the burglary conviction. Thus, the court did not sentence defendant on the mob action charge.

¶ 27        This appeal followed.

¶ 28                        II. ANALYSIS

¶ 29        On appeal, defendant contends he was denied his constitutional right to counsel because the trial court failed to comply with Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) before allowing him to proceed *pro se* at trial. Specifically, he argues the court failed to adequately inform him of the nature of the charges against him when he sought to proceed *pro se* in May 2025 because the court only spoke of the burglary charge at that time.

¶ 30        Initially we note defendant acknowledges he failed to object to the lack of Rule 401(a) admonishments at trial or in a posttrial motion. Thus, the issue was forfeited and cannot be considered on appeal unless it was plain error. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Defendant argues plain error applies.

¶ 31        "The plain-error doctrine bypasses forfeiture principles and allows a reviewing court to consider unpreserved error when: (1) the evidence is close, regardless of the seriousness of the error; or (2) the error is serious, regardless of the closeness of the evidence." *People v. Seal*, 2015 IL App (4th) 130775, ¶ 26 (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). However, a violation of the admonition requirement of Rule 401(a) is not cognizable as second-prong plain error. See *People v. Ratliff*, 2024 IL 129356, ¶ 46; *People v. Smith*, 2025 IL App (4th) 240512-U, ¶ 24. Before determining whether plain error occurred, we first determine whether error occurred at all. *People v. Ramirez*, 2013 IL App (4th) 121153, ¶ 72. If there is no error, then there can be no plain error. *People v. Tolliver*, 2021 IL App (1st) 190129, ¶ 36.

¶ 32        The state and federal constitutions grant defendants a right to counsel. See U.S.

Const., amend. VI; Ill. Const. 1970, art. I, § 8. This right applies to all critical stages of the prosecution. *People v. Allen*, 220 Ill. App. 3d 772, 781 (1991). However, a defendant has a right to waive representation by counsel and proceed *pro se*. *People v. Haynes*, 174 Ill. 2d 204, 235 (1996). Accordingly, a defendant may waive his constitutional right to counsel, as long as the waiver is knowing and voluntary. *Id.*

¶ 33        Rule 401(a) requires the trial court to complete a specific procedure before it can accept a defendant's waiver of counsel as knowing and voluntary. Under Rule 401(a), the court shall inform the defendant of and determine that the defendant understands:

"(1) the nature of the charge;

(2) the minimum and maximum sentences prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel, and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

The purpose of Rule 401(a) is to ensure that a waiver of counsel is knowingly and intelligently made. *People v. Reese*, 2017 IL 120011, ¶ 62.

¶ 34        Partially at issue here is what has been termed the "continuing waiver rule." See *People v. Ware*, 407 Ill. App. 3d 315, 342 (2011). "Under the continuing waiver rule, a valid waiver of counsel generally continues throughout later stages of the proceedings, including posttrial stages." *Id.* The rule is subject to two exceptions: (1) the defendant later requests counsel or (2) other circumstances suggest the waiver is limited to a particular stage of the proceedings. *Id.* "Circumstances requiring readmonishment include lengthy delays between trial stages, newly discovered evidence, new charges, or a request from the defendant." *Id.* Thus, a valid waiver may

end when a defendant requests counsel at a later time. *Id.* However, normally, the continuing waiver rule addresses the need for admonishments at a separate stage of the proceedings from the initial waiver of counsel. *Id.* Regardless, defective or even omitted admonishments do not *per se* invalidate a waiver of counsel, as strict, technical compliance with the rule is not required. *People v. Johnson*, 2023 IL App (4th) 210662, ¶ 76.

¶ 35 Substantial compliance will be sufficient to effectuate a valid waiver if the record indicates the waiver was made knowingly and voluntarily and if the admonishments the defendant received did not prejudice his rights. *Haynes*, 174 Ill. 2d at 236. Thus, despite a trial court's failure to mechanically follow the rule, when an examination of the record indicates (1) the waiver of counsel was made knowingly and intelligently and (2) the court's admonishment did not prejudice the defendant's rights, reversal is unwarranted. *Johnson*, 2023 IL App (4th) 210662, ¶ 76.

¶ 36 Each waiver must be assessed on its own particular facts. *Haynes*, 174 Ill. 2d at 242. Therefore, a reviewing court must evaluate whether a defendant has knowingly and intelligently waived the right to counsel by evaluating the record as a whole, including the background, experience, and conduct of the defendant. *People v. Lesley*, 2018 IL 122100, ¶ 51. "A defendant's level of sophistication is a factor to consider in determining substantial compliance." *People v. Hui*, 2022 IL App (2d) 190846, ¶ 51. In determining substantial compliance with Rule 401(a), courts do not focus solely on the admonishments given at the time the defendant waived counsel for the final time. See *Ware*, 407 Ill. App. 3d at 344-45. Instead, courts also look at the previous admonishments and facts throughout the record. See *id.* at 345. Whether a trial court failed to substantially comply with Rule 401(a) admonishments is a question of law we review *de novo*. *People v. Pike*, 2016 IL App (1st) 122626, ¶ 114.

¶ 37 Defendant focuses on the trial court's failure to admonish him of the mob action

charge the second time he waived counsel. On that point, we find *Ware* instructive.

¶ 38    In *Ware*, although the trial court gave the defendant complete Rule 401(a) admonitions the first two times the defendant switched to representing himself from being represented by counsel, the third and final time that happened, it did not give new admonitions. *Ware*, 407 Ill. App. 3d at 331. The *Ware* court found, when it considered the record as a whole, the trial court had substantially complied with Rule 401(a) where its earlier admonitions were in the same stage of the proceedings, they contained all the required information, and defendant was aware of the information contained in them. *Id.* at 347. The court in *Ware* also found the defendant was not prejudiced by any flaw in the admonitions. The court noted there was no indication in the record that, had the defendant been fully admonished, his actions would have been any different. *Id.* at 348. The defendant had been admonished a number of times throughout the pretrial proceedings, and those admonitions did not change the defendant's decision to repeatedly reject his appointed counsel. *Id.*

¶ 39    Here, we find there was no error because the trial court substantially complied with Rule 401(a), the record establishes defendant knowingly and intelligently waived his right to counsel, and defendant was not prejudiced by the incomplete admonition regarding the mob action charge. Defendant was correctly admonished of the nature of the charges the first time he waived counsel and stated he understood. He further asked for, and was given, a copy of the court's admonitions. When defendant sought to waive counsel the second time, the court failed to admonish him of the mob action charge. However, before trial began, the court informed defendant of both charges and the sentencing ranges. Defendant sought clarification about the sentencing ranges if the offenses were extended-term eligible and showed a clear understanding there were two charges. Thus, among the admonitions, defendant had all the required information.

- 14 -

¶ 40    Further, the record shows defendant suffered no prejudice from the incomplete admonitions. Defendant's background, experience, and conduct showed he had a good understanding of the legal issues and understood the nature of the charges. Defendant previously successfully obtained an acquittal in his murder case while appearing *pro se*. He then defended the instant case *pro se* twice, with no indication he did not understand the charges. Moreover, there is absolutely no indication that, had defendant been fully admonished the second time he waived counsel, his actions would have been any different. See *id.* Defendant was adamant that he wanted to proceed *pro se*.

¶ 41    Defendant additionally argues the trial court failed to inform him of the potential for discretionary consecutive sentencing. See 730 ILCS 5/5-8-4(c)(1) (West 2020). But the State did not seek consecutive sentences, and defendant was never sentenced on the mob action charge at all because that conviction merged with the burglary conviction. We recognize a defendant's waiver has been found unknowing and involuntary when the defendant was not informed of the potential for a discretionary consecutive sentence at the time of the waiver of counsel. See, *e.g.*, *People v. McKee*, 2022 IL App (2d) 210624, ¶¶ 34-36. Here, however, we find defendant's particular sophistication with the legal system and his insistence on proceeding *pro se*, when combined with the fact that he was never sentenced at all on the mob action charge, nevertheless shows he was not prejudiced by the omission. In similar circumstances, prejudice has not been found. See *People v. Brown*, 2023 IL App (3d) 210181, ¶¶ 53-55 (finding no prejudice when the defendant was not informed of the possibility of consecutive sentences). We are reminded that " '[W]hether reversal is required for an imperfect admonishment depends on whether real justice has been denied or whether the defendant has been prejudiced by the inadequate admonishment.' " *Id.* ¶ 53 (quoting *People v. Fuller*, 205 Ill. 2d 308, 323 (2002)). See generally, *People v. Wills*, 23

- 15 -

Ill. App. 3d 25, 32 (1974), *overruled on other grounds by People v. Wills*, 61 Ill. 2d 105 (1975) (holding, in the context of guilty plea admonitions, no prejudice results when a defendant has been admonished as to the maximum risk to which he exposes himself, though that risk is understated by the failure of the trial court to admonish of the possibility of consecutive sentences, provided the defendant is sentenced within the limits stated to him).

¶ 42     Here, defendant was neither denied real justice nor prejudiced by the inadequate admonishments. As previously discussed, the record as a whole shows defendant was adamant about proceeding *pro se* and fully understood his right to counsel. Then, not only did he not receive consecutive sentences, he was not sentenced for the charge of mob action at all due to the merger of the convictions. We also note defendant mentions the failure to admonish him about the possibility of consecutive sentences in only a few sentences of his brief and does not explain at all how the omission caused prejudice. Instead, defendant merely states the trial court ultimately disregarded the mob action charge. See *Brown*, 2023 IL App (3d) 2101816, ¶ 55 (noting the defendant's sole attempt at arguing how he was impacted by the inadequate admonishment appeared in just one sentence in his brief).

¶ 43     Further, even if we were to find error, we would not find plain error. Defendant argues the evidence was closely balanced because of the hung jury in the first trial and his characterization of the matter as a "credibility contest."

¶ 44     "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53 "That standard seems quite simple, but the opposite is true. A reviewing court's inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding

the witnesses' credibility." *Id.*

¶ 45 In *Sebby*, the defendant was convicted of the felony resisting a peace officer. *Id.* ¶ 1. On the resistance element of the offense, three responding officers testified the defendant resisted. *Id.* ¶¶ 55-56. Three other witnesses, including the defendant, testified the defendant did not resist and was instead being yanked around by the officers. *Id.* ¶¶ 57-58.

¶ 46 The *Sebby* court concluded the evidence was closely balanced. *Id.* ¶ 61. The court observed the State's witnesses provided accounts that were consistent with each other, as did the defendant's witnesses. *Id.* Neither party's version of events was fanciful. *Id.* The court rejected the State's argument the testimony of the defendant's witnesses was less plausible because those witnesses were relatives or friends of the defendant and might be biased. *Id.* ¶ 62. Notably, the court also observed that neither party's version of events was supported by extrinsic corroborating evidence. *Id.* The court found that, as in *People v. Naylor*, 229 Ill. 2d 584, 606-07 (2008), the outcome of the trial depended on a " 'contest of credibility' " between the officers and the defendant. *Id.* ¶ 63. The court explained that, because the outcome depended on two versions of events that were both credible, the evidence was closely balanced. *Id.* (citing *Naylor*, 229 Ill. 2d at 608).

¶ 47 However, the appellate courts generally have found no "credibility contest" when one party's version of events was either implausible or was corroborated by other evidence. See, *e.g.*, *People v. Effinger*, 2016 IL App (3d) 140203, ¶ 26 (determining circumstantial evidence supported the victim's version of events); *People v. Tademy*, 2015 IL App (3d) 120741, ¶¶ 19-20 (holding no "credibility contest" between experts where lay testimony corroborated one expert's testimony); *People v. Lopez*, 2012 IL App (1st) 101395, ¶¶ 88-90 (stating the evidence was not closely balanced where circumstantial evidence supported the State's witnesses' testimony, while

the defendant's version of events "strained credulity"); *People v. Anderson*, 407 Ill. App. 3d 662, 672 (2011) (determining the evidence was not closely balanced where the defendant's version of events was implausible).

¶ 48 Here, the evidence was not closely balanced. While defendant contended he was forced to commit the crimes and notes that Mitchell-Pastoriza's testimony corroborated his version of the events, the testimony was inconsistent with the extrinsic evidence provided by the surveillance videos. Although defendant and Mitchell-Pastoriza described three young men each with a gun, the evidence identified only one person with a gun. Mitchell-Pastoriza described the men as being dressed in black, but one was wearing green. Most important, the videos do not support defendant's assertion he was acting under compulsion. In the videos, defendant's actions, body language, and demeanor depicted a person who appeared willing to commit the crimes. Defendant initially entered the stockroom alone, opened the back door, and began pushing carts of items outside. The person in green and other people arrived thereafter. At one point, defendant was outside for over two minutes while the person in green and others reentered the stockroom. At the cash register, defendant appeared to be selective in what he took, placed items in bags, and set them aside. Defendant's assertion he was forced to take part in the crime strains credulity, and the videos were more than sufficient to persuade the jury defendant was not forced to take part in the crimes.

¶ 49 On the whole, the inconsistent testimony and the surveillance videos take this case outside the realm of closely balanced evidence and distinguish it from cases involving a lack of extrinsic corroborating evidence. "Thus, while the evidence might not have been overwhelming, it was not closely balanced for purposes of plain error." *People v. Olla*, 2018 IL App (2d) 160118, ¶ 38.

¶ 50    Because we hold there was no error, there also was no plain error. Further, even if error were found, the evidence was not closely balanced to support a finding of plain error. Accordingly, we affirm.

¶ 51                                    III. CONCLUSION

¶ 52    For the reasons stated, we affirm the trial court's judgment.

¶ 53    Affirmed.